(838 P.2d 354)

No. 67,546

IN THE MATTER OF THE APPEAL OF DERBY REFINING COMPANY FROM ORDERS OF THE DIRECTOR OF TAXATION.

Opinion filed August 28, 1992.

*Richard D. Greene*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, for the appellant.

*Mark A. Burghart* and *James Bartle,* of Kansas Department of Revenue, of Topeka, for the appellee.

Before REES, P.J., LEWIS, J., and PAUL E. MILLER, District Judge, assigned.

LEWIS, J.: Derby Refining Company (Derby) appeals an order of the Board of Tax Appeals (BOTA), denying it a compensating use tax exemption on the purchase of fluid catalytic cracking catalyst (FCCC), used in refining crude oil. Upon review, we are unable to distinguish this case from that of *R. L. Polk & Co v. Armold,* 215 Kan. 653, 527 P.2d 973 (1974). We consider that case controlling and, as a result, we reverse and remand.

Derby operates a refinery in Wichita in which it converts crude oil into products such as gasoline, diesel fuel, and liquid petroleum gas (LPG). The process of refining is complex, and the refinery is an integrated system which operates 24 hours per day.

Simplified to the extreme, Derby uses two principal methods in refining crude oil into salable products such as gasoline:

(A) Physical separation: This process takes place in a thermal separation unit where the crude oil is subjected to intense heat. The heat causes a thermal separation, which breaks down or separates other products from the crude oil.

(B) Chemical reaction: In this process, a catalyst is used to cause a chemical reaction in order to manufacture other products from crude oil. The reaction takes place in a catalytic reaction unit within the refinery. The product used to produce this chemical or catalytic reaction is the FCCC, the taxation of which is at issue in this action. It is clear that, without the FCCC, no chemical reaction would take place and no products would be manufactured from the crude oil.

The FCCC in question is a granular substance which is specifically manufactured for Derby, who purchases it from the manufacturer.

The catalytic reaction takes place in a fluid catalytic cracking unit (FCCU), and this process produces in excess of 50 percent of the gasoline produced at the refinery. It also produces other products such as LPG and diesel and, as a by-product, asphalt.

As might be expected, Derby purchases a huge quantity of the FCCC for use in its refinery. The total capacity for the catalyst

in the FCCU is 90 tons. This 90 tons of catalyst moves through the system every nine minutes over 100 times per day. Fresh catalyst is added to the system at a rate of approximately 4.5 tons per day.

The catalytic reaction occurs in a closed system. Once the catalyst is placed into the system, there is no way to remove it until its economic value has been totally dissipated. Fresh catalyst alone is very active and would not produce the desired products unless mixed with used catalyst. When catalyst reacts with gas oil, it is coated with metals and coke (reactor carbon). That portion of the catalyst on which metal is laid down becomes forever useless and is unable to produce the desired chemical reaction. The portion which is coated with coke does not become immediately useless and can be used again in the system if the coke is removed. Used catalyst is moved from the reactor to a regenerator in a continuous cycle at the rate of 10 tons per minute. The purpose of the regenerator is to burn off the coke, which has been laid down in the catalytic process. The regenerator cannot remove the metal from the catalyst. After the coke is burned off, the catalyst, which is reduced in activity, is then mixed with fresh catalyst and placed back into the reactor.

The process described above is closed and continuous. It results in the complete dissipation of the catalyst insofar as its use and value is concerned. Of the 4.5 tons of fresh catalyst added per day, 51 percent is dissipated within 24 hours. The balance of the catalyst loses its value to make gasoline in slightly over four days. Ultimately, the deactivated catalyst is removed from the system and deposited in the city dump or landfill. It has no value whatsoever to Derby at this point.

The question involved in this appeal is whether the FCCC is exempt from compensating use tax. The Kansas Department of Revenue (KDR) audited Derby for the period 1984 through 1987. As a result of this audit, KDR assessed a compensating use tax on Derby's purchase of FCCC, which together with interest and penalties totaled $142,311. A hearing was held before the designee of the director of taxation, who upheld the assessment. The director of taxation denied Derby's petition to review that order. Derby then appealed to BOTA. BOTA upheld the assessment, and Derby appeals that decision to this court.

## STANDARD OF REVIEW

Pursuant to K.S.A. 1991 Supp. 74-2426(c), BOTA orders are subject to judicial review pursuant to the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601, *et seq.* In that Act, the scope of review is dictated by K.S.A. 77-621, which has a somewhat broader scope than the scope which existed before the adoption of the Act. See *In re Tax Appeal of A.M. Castle & Co.,* 245 Kan. 739, 741, 783 P.2d 1296 (1989); *Kansas State Board of Healing Arts v. Foote,* 200 Kan. 447, Syl. ¶ 1, 436 P.2d 828 (1968).

K.S.A. 77-621(c) sets forth the scope of review. Insofar as it is pertinent to the appeal in question, the statute reads as follows:

"The court shall grant relief only if it determines any one or more of the following:
. . . .
"(4) the agency has erroneously interpreted or applied the law;
. . . .
"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in the light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or
"(8) the agency action is otherwise unreasonable, arbitrary or capricious."

Derby contends that BOTA erroneously interpreted and applied the relevant law and made determinations of fact not supported by the evidence. We agree with Derby's contentions in this regard, hence, our decision to reverse and remand.

## IS FCCC EXEMPT FROM PAYMENT OF COMPENSATING USE TAX?

*(A) GENERAL RULES:*

The question which we must decide is whether Derby's purchases of FCCC are exempt from compensating use tax. In this regard, a number of general rules have application.

In Kansas, taxation is the rule and exemption is the exception. *Assembly of God v. Sangster,* 178 Kan. 678, 680, 290 P.2d 1057 (1955). The burden of establishing an exemption from taxation is on the party claiming the exemption. *Director of Taxation v. Kansas Krude Oil Reclaiming Co.,* 236 Kan. 450, 454, 691 P.2d 1303 (1984). One who claims a tax exemption must bring himself

clearly within the exemption provisions of the statute. *Warren v. Fink,* 146 Kan. 716, Syl. ¶ 1, 72 P.2d 968 (1937). Statutory exemption provisions are strictly construed against the party requesting exemption. *Farmers Co-op v. Kansas Bd. of Tax Appeals,* 236 Kan. 632, 635, 694 P.2d 462 (1985). All doubts concerning exemption are to be resolved against the exemption and in favor of taxation. *Trustees of The United Methodist Church v. Cogswell,* 205 Kan. 847, 851, 473 P.2d 1 (1970).

As can be seen, Derby has a considerable burden in the matter at hand. However, we have applied the rules stated above to the facts of this case. In doing so, we conclude that Derby has sustained its burden of proof, and the product in question is exempt from compensating use tax.

*(B) CONTROLLING STATUTES:*

As we view the issues presented on this appeal, there are two statutes which are directly applicable to the question at hand.

K.S.A. 1991 Supp. 79-3606 provides a detailed listing of sales and property which are exempt from the sales tax and the compensating use tax. The specific exemption at issue is set forth in K.S.A. 1991 Supp. 79-3606(n), which reads as follows:

"[A]ll sales of tangible personal property *which is consumed in the production, manufacture, processing, mining, drilling, refining or compounding of tangible personal property,* the providing of services or the irrigation of crops for ultimate sale at retail within or without the state of Kansas; and any purchaser of such property may obtain from the director of taxation and furnish to the supplier an exemption certificate number for tangible personal property for consumption in such production, manufacture, processing, mining, drilling, refining, compounding, irrigation and in providing such services." (Emphasis added.)

There is no question but that the FCCC involved in this appeal is tangible personal property. The determining question is whether the FCCC "is consumed in the production, manufacture, processing, mining, drilling, refining or compounding of tangible personal property." The term "consumed" is a term of art, and is defined by K.S.A. 79-3602(m) as follows: " 'Property which is consumed' means tangible personal property which is essential or necessary to and which is used in the actual process of and *immediately consumed or dissipated* in (1) the production, man-

ufacture, processing, mining, drilling, refining or compounding of tangible personal property." (Emphasis added.)

It is clear that the catalyst is essential and necessary to, and is used in, the process of refining gasoline and other salable products from crude oil. The question is whether the FCCC is "immediately consumed or dissipated" in that process.

BOTA held that the FCCC was not "immediately consumed" in the refining process. Accordingly, BOTA concluded that the FCCC was not exempt under 79-3606(n). We hold BOTA erred in this conclusion.

*(C) LEGISLATIVE HISTORY:*

KDR contends that the legislative history of K.S.A. 79-3606(n) and 79-3602(m) shows a clear intent by the legislature to exclude catalysts from property which can be determined to be exempt. We disagree.

KDR points out that, when 79-3606 was enacted in 1963, catalysts were specifically listed as property exempt under the act. L. 1963, ch. 494, § 1. In 1970, the statutes were rewritten and the term "catalyst" was removed from the statutory list of items specifically exempt from the tax. L. 1970, ch. 389, § 4. This 1970 legislation, it is argued, was a clear indication that the legislature intended to terminate the exempt status of catalysts and subject them to tax. In order to bolster its contention, the department cites to us various items of legislative history, such as committee reports and the like, leading to the 1970 amendment.

We have examined the legislative history submitted and do not intend to lengthen this opinion by a discussion of that history. We do not find the legislative history to be controlling or even to clearly reveal the legislature's intent in the manner contended by the department.

As we read the statutes involved, they are plain and unambiguous. Under these circumstances, legislative history becomes irrelevant. "When a statute is plain and unambiguous the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be." *Randall v. Seemann,* 228 Kan. 395, Syl. ¶ 1, 613 P.2d 1376 (1980). See *In re Appeal of News Publishing Co.,* 12 Kan. App. 2d 328, 332, 743 P.2d 559 (1987). In the instant matter, we find

nothing in the amendments of the statutes in question evincing an intention to exclude catalysts from property that can be determined to be exempt.

The 1970 legislative enactments do not remove catalyst from the list of property declared to be exempt under 79-3606(n). That statute exempted all property "which is consumed" in the refining process. The statute does not prohibit a finding that a catalyst is "consumed" in the refining process. The statute indicates a decision to exempt "consumables" as a class rather than through a listing of specific items. The general class defined does not exclude "catalyst" if the facts show it to be property which was "consumed" in the process.

In order to assist in the determination of what is or what was or was not "consumed," the legislature enacted 79-3602(m), a portion of which is quoted above. L. 1970, ch. 389, § 1. After the statute defines property which is "consumed," it goes on to list specific items which the legislature states are included within that definition. It is true that the term "catalyst" is not specifically listed as property which is consumed. However, before listing the specific items, the statute provides:

"The following items of tangible personal property are hereby declared to be 'consumed' *but the listing of such property shall not be deemed to be exclusive nor shall such listing be construed to be a restriction upon or an indication of, the type or types of property to be included within the definition of 'property which is consumed' as herein set forth.*" (Emphasis added.)

The fact that the legislature did not see fit to specifically list catalysts as property which was "consumed" does not indicate to us an intent to exclude the term catalyst from that definition. The emphasized language of the statute clearly indicates that its list is not exclusive and is not even to be taken as an "indication" of the type of property which may be "property which is consumed." The exemption is determined on a case-by-case basis, and catalysts are not removed from the decision process.

Finally, if the legislature had wanted to specifically exclude catalysts and brand them nonexempt, it could have easily done so in so many words. It did not. We see no merit in the department's position that the 1970 legislation should be construed to exclude catalysts from the definitions set forth in 79-3602(m)

and 79-3606(n). We hold that no such exclusion was intended, and no reasonable construction of the statute would support such an exclusion.

## (D) IS THE FCCC "IMMEDIATELY CONSUMED" IN THE RE-FINING PROCESS?

BOTA concluded that, because the catalyst was reused after being subjected to a regenerator, it was not "immediately consumed" in the refining process. It reached that conclusion despite the following findings:

"A cyclone on top of the regenerator will remove some of the catalyst. Once removed by the cyclone, the catalyst is gathered and deposited at the city landfill. Most of the FCC catalyst is removed after it falls to the bottom of the regenerator. The catalyst at the bottom is manually removed and deposited in the city landfill. Once removed entirely from the system, the catalyst cannot be reused and placed back into the system.

. . . .

"Fifty-one percent (51%) of the fresh catalyst is removed from the system within a 24 hour time span. The estimated life of the catalyst is four days assuming that no new catalyst is added."

The findings of BOTA indicate that, within four days after being placed in system, the catalyst is dissipated, consumed, and rendered useless. BOTA concluded that, once the catalyst was removed entirely from the system, it was valueless and could not be reused and placed back into the system. Despite these findings, BOTA did not consider that the catalyst fell within the definition of "immediate consumption." Our review leads us to conclude that BOTA erred in reaching such decision.

This case is controlled by *R. L. Polk & Co v. Armold,* 215 Kan. 653, 527 P.2d 973 (1974). That case dealt with the question of whether film, lithoplates, developer, and other supplies used to print city directories were "immediately consumed" by the process of production. The facts developed indicated that the film in question was used from four hours to two days and that the lithoplates were used in three to five or six days and then sold for junk. The use and dissipation of the developer was described as follows:

"Developer is used for both film and plates. It is kept in a ten gallon film developing tank approximately two days. It weakens as the film goes through and is replenished by taking two gallons out of the tank and adding two gallons of developer, which procedure could occur every two or three days

or two or three times in a day, depending on the amount of film used. Developer removed from the tank is destroyed." 215 Kan. at 654.

We find the similarities between the FCCC in this case and the developer in *Polk* to be remarkable. In both cases, KDR argues that the items were not "immediately consumed" by the process. We are unable to find any significant distinction between the developer in *Polk* and the catalyst in this case. If the developer in *Polk* was "immediately consumed," then so was the FCCC in the instant matter.

In *Polk*, the Supreme Court stated the issue as follows:

"Appellant's principal argument is that the materials are not immediately consumed or dissipated. Appellant contends that use of the term 'immediately' indicates a time referent and since there are varied time lapses in the consumption of the various items they are not immediately consumed. In *Natural Gas Pipeline Co. v. Commission of Revenue & Taxation,* 163 Kan. 458, 183 P.2d 234, this court was concerned with the construction of a word in our compensating tax act which was susceptible of more than one meaning. The court stated:

'Long ago, in *City of Emporia v. Norton,* 16 Kan. 236, we held that in the determination of legislative intent the court is not limited to mere consideration of words employed, but may properly look to the purpose to be accomplished, the necessity and effect of the statute, under the different constructions permitted by its terms.' (p. 467.)

"In *Southwestern Bell Tel. Co. v. State Commission of Revenue and Taxation,* 168 Kan. 227, 212 P.2d 363, this statement appears:

'There is one basic principle about our sales tax act. It is that the ultimate consumer should pay the tax and no article should have to carry more than one sales tax.' (p. 233.)

"In *Gr. Inc. Tax Dept. v Harbison-Walker Ref. Co.,* 113 Ind. App. 695, 48 N.E. 2d 834 (Transfer Denied), the court was confronted with a contention similar to that made here by appellant. A taxing statute prescribed a lower tax rate on income derived from the sale of material directly consumed in production. The statute defined 'consumed' as immediate dissipation. The court stated:

'That there is here involved a dissipation or expenditure by use is a certainty beyond the realm of conjecture. The term "immediate," however, is one admitting of a wide variety of definitions. It is the indicium of a time interval as well as that of an interval of space. It can indicate relativity or continuity. It is the opposite of ultimate. It is qualitative, not quantitative, relative, not absolute. In its strictest sense as a time referent it means the present instant, instantaneously, without appreciable lapse of time; but to give the term this literal interpretation would strip the section here in controversy of all practical sense and applicability. [pp. 699-700.]

. . . .

'If, as appellant urges, the term "immediate" as used in the statute is a time referent then his argument falls under the weight of authority in this and other states for it has been held generally that the construction of the term when it occurs in contracts or in statutes is, that the act referred to shall be accomplished within such convenient time as is reasonably requisite.. [Citations].' (p. 700.)

"The court concluded that where silica refractory material used for lining open hearth furnaces could be used only for a few weeks or months due to the heat, such material was 'consumed immediately'." 215 Kan. at 657-58.

After discussing the issues and the question of how to define the term "immediate," our Supreme Court held that the items involved in the case had been "immediately consumed":

"In the case at bar consumption or dissipation of the property in question, as opposed to depreciation, breakage, wearing out or obsolescence, as in the case of permanent machinery or equipment, has been shown. The dissipation of the developer was continuous. The entire process of manu-facture occurs over a relatively short period of time, during which some consumption or dissipation takes place and after which the property or materials are rendered useless for all practical purpose. The manufacture is accomplished within a time reasonably requisite. Accordingly, we hold that the items are shown to have been immediately consumed within the purview of the exemption statute." 215 Kan. at 658.

We decide the instant matter by paraphrasing *Polk*. In this case, it has been shown beyond any doubt that the catalyst is totally consumed and dissipated by the refining process. The dissipation of the catalyst is continuous, despite the fact that part of it can be regenerated and reused during the process. The regeneration only interrupts the course of dissipation, and that process continues unabated until the catalyst is rendered useless. The entire refining process occurs over a relatively short period of time, during which the catalyst is rendered useless and val-ueless. The process is accomplished within a time reasonably requisite. In accordance with the dictates of *Polk*, we hold that the evidence in this case shows the catalyst to have been im-mediately consumed within the purview of the exemption statute.

BOTA held that *Polk* did not apply and attempted to apply the case of *In re Appeal of Angle*, 11 Kan. App. 2d 62, 713 P.2d 962, *rev. denied* 239 Kan. 693 (1986). We hold that *Angle* has no application to the instant matter. *Angle* dealt with oil well

drill bits, which could be used over and over again and on more than one oil well. That case has no relevancy to the facts presently before this court. BOTA's efforts to distinguish *Polk* and apply *Angle* are unconvincing.

Derby raises other issues relative to its assessment which we need not and do not reach in view of our decision as set forth above.

The order of BOTA is reversed, and the matter is remanded with directions to uphold Derby's claims of exemption and to withdraw the assessment of taxes, interest, and penalties.

Reversed and remanded with directions.